May it please the Court, Eric Levin for Defendant Appellant Michael Dreyer. I'd like to reserve three minutes for rebuttal. Watch the clock, Counsel. In the time I have available this morning, I want to focus my comments on two issues. First, the misrepresentations in the Church warrant application, and second, the Daubert issue. Could I ask you about a preliminary matter? Yes. There are some sections of the Code of Federal Regulations that appear to address this Naval Investigative Unit, and neither side used them. They used directives and other stuff where our duty under Chevron is not the same. Is there some reason? Are the regs inapplicable or what? You know, to be perfectly candid, I'm unaware of the regulations we had cited. 32 CFR 182.4 and 182.6. I don't believe it was raised by either party. It wasn't, and it's kind of a dog that didn't bark for me. I'm wondering, are they irrelevant for some particular reason or were they just missed? You know, to be perfectly candid, I don't know the answer to that, but if you want that dog to bark, I would be happy to do that in a post-hearing submission. It's about participation of DOD personnel in civilian law enforcement activities. Well, if we want to get to that issue, then the directive that I'm aware of came from, I believe it's 10 U.S.C. 375, which directed. Yeah, that's the statute, and I'm asking about the regs. Well, my understanding is that what was issued. 13.10, is that what we're talking about? Well, first came 10 U.S.C. 1385, which prohibited military personnel from participating in civilian law enforcement activities. 10 U.S.C. 375 directed the Secretary of Defense to regulate this participation, and based on that they issued several directives. Secretary of Defense, Directive 5525.5. The Secretary of Navy then came out with a very similar regulation. Those issues, those essentially directed its personnel not to participate directly in civilian law enforcement. Let me ask you about another aspect of this. Is there any case law that says to apply the exclusionary rule to a violation of the Posse Comitatus Act or its regulatory implementation beyond what the Act itself says? The Act doesn't speak to the Navy, but the regs do. The Act does not speak to a remedy. However, this Court did in United States v. Robert. It indicated the violations of 10 U.S.C. 375, that an exclusionary rule remedy was appropriate when a need to deter future violations was demonstrated. Now, there's not enough of a showing in this case for the need to deter future violations, is there? I disagree with that. I think there is, and there is for a couple of reasons. The agent, the NCIS agent who testified here, who began this investigation, indicated that he believed that monitoring computers, trading, and child pornography was an interest of the Navy, and therefore he engaged in this type of investigation repeatedly. Well, there would be lots of areas where the military and the civilian law enforcement goals will overlap, and as long as there is a military rationale, isn't that enough? Well, in United States v. Chong, this Court said that the military purpose exception, which is I believe what you're addressing, sanctions military assistance where the illegal acts are perpetrated by military personnel or by civilians. Or on a military base or involved military objects. But here, he was just looking at everybody in Washington, and the theory seemed to be that there are a lot of Navy people in Washington, but how many is a lot? There's nothing in the record to indicate that at all. I would liken it to NCIS agents conducting traffic stops on the off chance that maybe there will be someone over whom we have jurisdiction. Now, certainly there was a certain different order of magnitude here, but he is engaging in surveillance. He is engaging in subpoenaing records. Those are the kinds of things that the military regulations specifically identify as direct participation and direct them not to do unless there is jurisdiction. You didn't want to talk about this issue, so why don't we talk about what you want to talk about? Okay. But I'm happy to talk more about this. With respect to the Franks issue, at the Franks hearing, the defense argued, the government conceded, Let's assume that Scrimpture is totally unworthy of belief. You've laid out plenty of material on the record to support that. Okay. Why doesn't it not matter because of the Logan hearsay? Hearsay is okay on an application for a search warrant, and it looks like Logan laid out a basis for one. Okay. Then what I'm reading into your question is that you have rejected the testimony from Scrimpture that he explained to the judge how to warrant. No, I'm saying let's assume we do. I didn't say this is it, but you laid out a good basis for assuming that Scrimpture is totally unworthy of belief. If Scrimpture is totally unworthy of belief, then it is unworthy of belief that he actually informed the judge of the origin of this investigation. Well, wait a minute. I thought it was right in the affidavit that he said what Logan's report said. What he said is I received this information. It's attached as addendum A. So it's in the affidavit. Well, I would question that. Was Logan's addendum A a staple to the hearing? Nothing is labeled addendum A. There is no addendum A labeled. There is no file stamped copy. In order for us to believe that an addendum or the items that the government reports was attached to the search warrant were in fact attached, we have to rely on Scrimpture's testimony. You mean we don't have a copy of the application for the search warrant with addendum A in the excerpts? We have a copy of the search warrant with some attachments, and we have to rely on Scrimpture to believe that this is what, in fact, he presented to the judge that issued the warrant. But even if we do, even if we did credit Scrimpture, this is ER 295, is the actual what is reported. Yeah, it looks like it's the Logan report, isn't it? It is. Yeah, the Logan report is actually what the trial court relied on wasn't, in fact, the first two pages or anything labeled addendum A. It was something called Exhibit 1, which is located at excerpts of Record 297 to 300. But even if we credit Scrimpture's testimony that he presented this to the trial, to the judge issuing the warrant, the Exhibit 1 itself fails to establish probable cause to believe that child pornography would be found on Mr. Dreyer's computer. Exhibit 1 reports, and in Exhibit 1, Logan reports that he downloaded three files directly from an IP address, later determined to belong to Mr. Dreyer. But at the hearing, he testified that he was actually connected through a web-based program called Roundup, and that he downloaded the child pornography through that program. And so the functionality of this program is at the heart of the issue. And, in fact, Government Trial Exhibit 100, which is an excerpt of Record 479, reflects that Logan wasn't even connected to one single IP address, but was connected to multiple IP addresses at the time of the download. So, from Logan to the how much of all this Logan attachment covers, there's all this material in the warrant, which is also not true, that says, by my, in the affidavit, by my training experience, I know that it's impossible to success, which goes to the scope of the warrant, all of which he didn't know anything about either. Correct. That was the omission that the judge found, that he never revealed, that he had never participated in any type of investigation. And that's not background. That goes to what the scope of the warrant was. Absolutely. He relied on that, on his, what he said was his training experience. And the Logan material doesn't go to that. That's correct. That's my understanding. What was significant about the Logan report is that he never claims that Roundup, like the effects program that Shremsher told the court he had used, but in fact hadn't, he never testified that the Roundup had the capability of conducting a single-source download, nor could he. Logan testified he wasn't a computer expert, didn't know about any test reports or error reports or validation reports with respect to this Roundup program. And he said he's unaware of its reliability or whether it had even been assessed. And so for these reasons, even if you accepted Shremsher's testimony, that he had included this information, it simply wasn't enough. But it does strike me as jarring reality to think that a judge seeing, if the judge had seen this addendum, if the judge had known the truth, that she would have permitted him to swear out a search warrant application that was so false. And he swore this out right in front of the judge who issued the warrant. You're talking about the judge who issued the warrant. Yes, that's correct. What did Judge Peckman know when she determined, in terms of his credibility? She knew some of it. She knew that he had been terminated from the King County Sheriff's Office as a result of an internal affairs investigation. He's been fired by two law enforcement offices for basically dishonesty, isn't he? I am unaware whether he was actually terminated from the Sheriff's Office in Missouri. I did make what's called a Missouri Sunshine Law request there, but unfortunately it's not as broad as Washington's Public Disclosure Act, and I believe I need to be in the district court to file a Rule 17 subpoena to actually get that information. Missouri Sunshine Law exempts things in personnel files from disclosure to the public. So I have not been able to verify that beyond what I found with respect to that particular case. I believe he denies that he was fired in media reports. The second issue I wish to address is the Daubert issue. And with respect to the Daubert issue, the trial court erred in not conducting a Daubert hearing. The trial court believed that the reliability of Roundup wasn't at issue because even if it worked once or she likened it to a bulldozer or a shovel, it just simply uncovers evidence and therefore proves itself. And I think that misapprehends the significance of Roundup in this prosecution. The government relied on Roundup not simply to validate. It validated authenticated results. With respect to the possession count, Logan testified that Roundup was able to compare the hash value of the images to its own database, into a national database, and then highlight it in red if it's a known image of child pornography. But with respect to the distribution count, and so that put at central issue the functionality of this program. With respect to the distribution count. As to that case, Judge Pickens' perception is correct. I mean, if you have it, you have it. So what's the issue with me? Well, if it functions as advertised. If it is able to download, realize that traditional file sharing. I understand your argument. It's that for the distribution count, you had to be able to demonstrate, the government had to be able to demonstrate that this actually came from his computer. That's right. And that that depends on a different function of Roundup, i.e., getting it all out from one computer. That's absolutely right. And for that reason, failing to conduct a Daubert hearing means that it shouldn't have been introduced at all. Logan was unable to testify to any of these things. He had no qualifications. Did he testify to whether or not it all came off the other computer? He simply said at trial that he had done a, I believe he called it, what's called a single source download is what he called, said it. But he never was able to testify to his functionality because he had no background in it. This stands in contrast to the First Circuit case, United States v. Chiragio, where that agent, that FBI agent, had significant specialized experience with that program and recreating the sessions of that program, testified it had no error rate, demonstrated how it could be independently verified, and testified it never yielded a false positive. Logan couldn't testify to any of those things. Counsel, you're down about a minute and a half, if you wish to reserve. I will. You may do so. We'll hear from the Governor. Good morning, Your Honors. May it please the Court, Marcy Ellsworth, Assistant United States Attorney for the Western District of Washington, representing the United States this morning. I'd like to get straight to the questions about the Posse Comitatus Act and specifically to Judge Kleinfeld's question about whether there was any case law that actually applied the exclusionary rule. There is not. And the Roberts decision. But there is a decision that has a holding about applying the exclusionary rule. Correct, and that's the Roberts decision from this circuit back in 1986. And what the Roberts decision said was that we would look to see if there was evidence of a widespread violation. Here there is, isn't there? If we thought it was a violation, it would be a widespread violation. There is no evidence that this is a widespread violation. Help me with something else on this. I look at Title 10 of the United States Code at Section 375, Restriction on Direct Participation by Military Personnel. And it says, The Secretary of Defense shall prescribe such regulations as may be necessary. And then it goes on to say what they're not supposed to do. And then it says, By a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, and so forth. And then I look at the Code of Federal Regulations, and it appears that, well, here are the regulations at 32 CFR 182. I think it's .6 and .3 of the regs. And neither side cited them. So I am wondering whether I am just looking at the wrong thing, or those regs don't apply, or what? Your Honor, I don't know the answer to that question. You didn't see them either? I didn't see them. But what I did see was 10 United States Code, Section 7480. That was enacted in October of 2010. You understand, I'm asking you about the regs. Does this section speak to that? I do understand that. But this section of Title 10, Section 7480, speaks specifically to the civilian special agents of the Naval Criminal Investigative Services. It doesn't talk about the regs, though. It doesn't talk about the regs. It does not talk about the regs. I was asking about the regs. Correct. Okay, so basically I have nothing from either side about whether these regs are relevant to this case, even though on their face they appear to be regs written to carry out the statutory directive. You do not, Your Honor. Okay. But what you do have is a citation to 7480. Yeah, I know, but that's about something else. It's about giving civilian law enforcement authority to the special agents. Yeah, I understand that. And we'll get to that. What statute is that in? That's Title 10, United States Code, Section 7480. Yes. Enacted October of 2000. It gives the NCIS special agents the same authority to execute, serve warrants, and other processes, make arrests with or without a warrant, as are provided to agents of the Defense Criminal Investigative Services. But it doesn't speak to the regs. No, it does not. So we can get to that. Why does that tell us? That tells us that Congress has specifically authorized NCIS agents to have these civilian law enforcement powers and authorities subject to regulation prescribed by the Secretary of the Navy. And the Secretary of the Navy has directed in his instructions that ---- Sorry. It all says that they have the same authority as the special agents of the Defense Criminal Investigative Services. Correct. Right? Is this in derogation of the Posse Comitatus Act? Is that what you're saying? What I'm saying is that the Posse Comitatus Act specifically says that unless otherwise authorized by Congress, you can't use members of the military to enforce the civilian law. You can't say that you can't. I don't see where the statute says you can't. Where which statute? What you're talking about, 7480. 7480 is granting these special agents status as civilian law enforcement agents and is granting them the same law enforcement authority ---- No, it doesn't. It just says they can execute search warrants and other process like civilians. It doesn't say they can act as civilians. They are civilians. They are civilian employees of the Department of the Navy. Kind of like Halliburton in Iraq or Booz Allen for making military policy in Washington, D.C. I mean, the military uses a lot of civilians for military functions. And I gather it has civilian employees here. But let's get back to the question I wanted to ask you because we keep getting away from it. The next ---- I know you'd rather talk about other things. That's fine, Your Honor. The next question I'd like to ask you is, has the Department of Defense been informed by the U.S. Attorney's Office of this case so that they could file an amicus brief or seek to participate in some way? I'm a little concerned that we may be making a decision that affects what the Navy can do without hearing from the Navy or the Secretary of Defense about how they interpret what the Navy can do. Did the U.S. Attorney's Office inform them? I did reach out to NCIS. I don't know what reach out means. I spoke with an NCIS. You called an NCIS person on the phone? Yes, in the fall and indicated that the issue was coming up before the court and sent him a copy of the briefing, and I did not hear anything in response. I contacted NCIS again last week and was informed that my request, my renewed request, had made it up to the number three person at NCIS, but that the director was out of the country in Bahrain this last week. So you ---- and that was an email or something? Yes. Okay, so you have ---- Actually, that was in a phone call, finding out that he was in Bahrain. So you have contacted NCIS and they never decided one way or the other whether the Navy is going to get involved? Correct. Okay. That's what I wanted to know. And going back to the question about application of the exclusionary rule, what the Roberts Court was specifically looking at is whether there was any evidence of a widespread violation. Let me ask about that. As I understand it, what this NCIS outfit somewhere in the south, I forget which state it was, did was they basically checked every computer in the state of Washington on the ground that Washington has military bases. Alaska would qualify even more. The Navy NCIS in Georgia or someplace could check every personal computer in Alaska because Alaska has a fairly substantial military presence. Why doesn't that need to be deterred as going way beyond making sure the sailors aren't having bar fights in waterfront bars or that some sailor's spouse isn't part of a dope ring on base, that sort of thing? First, I did want to address in response to your question and something that Judge O'Scanlan brought up, there is overlap. There's clearly an independent military interest. If you could do this, why couldn't you stop everybody and stop and frisk everybody on the street in Washington because they might be a military person and they might be in the course of conducting a crime. Why couldn't the NCIS people do that? What the NCIS agent was doing here was limited by the technology available to him. He received a request. But the law won't be limited by the technology. On Saturdays in my town, there's a solid line of traffic from Walmart to and from the military base. It's an unbroken line because so many of the military from Fort Wayne might shop at Walmart. And what I'm thinking is that military law enforcement could enforce shoplifting laws in Walmart, traffic laws on that line of traffic because some of them may be military. Your Honor, specific to the issue here, Agent Logan is looking for individuals distributing child pornography over the Internet in the state of Washington. The whole state, everybody in Washington. That's all the technology enables him to do. That's as far down as he can limit the search parameters. I understood that. He's saying, well, I can't narrow it down to military personnel, so I just check every human in Washington, every computer in Washington. No, the particular IP address that he isolated here resolved back to Federal Way, Washington, within a 30-mile radius, within that 30-mile radius. He absolutely did not say that's what he was doing. He did say he was looking at everybody in Washington. Did he not? Did he ever say that he was limiting his search at all with regard to computers in Washington? His testimony is that he was limited to the state of Washington, yes, that he sets the search parameters to the state. But there was a large military presence in Washington, which is maybe relatively large, but it's still minuscule compared to the population of Washington. In raw numbers, yes. But the geographic area that he ends up identifying with Mr. Dreyer's IP address is within the 30-mile radius that software allows him to search. In that 30-mile radius, you have two naval installations, plus you've got Fort Lewis, the largest military installation on the West Coast. Isn't that fortuitous? Somewhat. It was somewhat fortuitous. In terms of the scope of his search? But when he's searching, he can't. His testimony is he doesn't know who's on the other end. Exactly. So he wasn't trying to limit it to the particular locations where there were more rather than less military people. He was looking at everybody in Washington. He couldn't narrow it any further. Right. So it's irrelevant that it happened to turn out that this was closer rather than further from a navy base. It's relevant in the sense that once he determines – I suppose under your theory, because of the limitations of technology and the widespread presence of military bases all over America, I mean, every congressman tries to get one. NCIS could check every computer in America, couldn't it, for child-born? I don't believe they could check every computer in America, no. There would certainly be – No bases in Vermont? There would be some areas where there was no justifiable reason. Here he's saying – Well, it's a matter of what the state borders are. I mean, you'd have to look at whether there's, you know, the distances, right? If the technology existed to be able to narrow it down more specifically, Agent Logan testified, if I had the capability to know that this IP address belongs to a military member, that would greatly enhance my investigative ability. So you're saying the military power is greater to enforce civilian law against civilians when it's harder for them to narrow it down? No, what I'm saying is that the technology limits his ability to narrow the scope of his search any further than he did. What's important is that once he identifies that Mr. Dreyer is not a member of the military, he refers it. Why isn't this like martial law for the whole country, at least as far as child-born goes? Well, in the first place, Special Agent Logan is a civilian employee. He's not a member of the military. He is not a uniformed military officer. There's no uniformed military officer in the state. The military uses civilians for military purposes. I mean, to drive soldiers from one part of the base to another, they often employ civilian bus drivers to do it, driving on one part of the base to the other. They used to use, I don't know, Spec 4s, Spec 5s to do it. It's just a budget issue. The whole purpose of the Posse Comitatus Act was to end martial law after the Civil War, and the reasons for its construction have generally related to that historical purpose. And I'm just wondering why your argument wouldn't blow a hole in it. The historical purpose of the Posse Comitatus Act, enacted after the Civil War, was to prevent the abuse of the military in the Reconstruction South, to prevent the marshals from calling up the military and saying, let's control the election. It would have satisfied the purpose if instead of having somebody in a military uniform, they had somebody who was a civilian person working for the military. I'm not sure I understand your question. Heather, you're saying the fact that your posse has to be they were only concerned about enlisted people, and they weren't concerned about people who were working for the military but weren't actually in the military. They were concerned about individuals trading child pornography over the military. No, no, I'm talking about historically. Historically, they were concerned about federal law enforcement, the marshals calling in members of the military to assist in controlling the elections and collecting revenue from the citizenry. That was the legislative history behind the purpose of the Posse Comitatus Act. I'm asking you about what I think is a different one, 32 CFR 23.10, which is restrictions on participation of DOD personnel in civilian law enforcement activity. And it seems to be talking about DOD personnel in general, military and non-military. Is that right? Those are the restrictions that are found in the DOD directives, and they do prohibit the direct participation unless there's an independent military purpose. So they don't distinguish between whether it's military or non-military. It's DOD personnel, right? This person was certainly DOD personnel. I'm not familiar with the CFR you're citing, but the DOD directive. I just read you the heading. Restrictions on participation of DOD personnel. And that's what's contained in the DOD directive, and it does restrict them from direct participation unless there's an independent military purpose. Yes, but for present purposes, my point is that it isn't restricted to, doesn't distinguish between civilian and non-civilian DOD personnel. No. The CFR as you're citing, it does not. Could we talk a little bit about the search warrant? Sure. The trial court heard the testimony. She was, she had it in front of her that Detective Shremsher had been terminated for violating the dishonesty policy. She nonetheless credits his testimony to the extent that he's attached Special Agent Logan's report as a demo. But that doesn't really do it with regard to a lot of what's in the warrant affidavit,  The scope, the warrant itself, which is in the record, authorizes the search of computers. It was in the affidavit that was directed at the scope of the warrant, and it was in the voice of Shremsher, is that his name? Shremsher. And it said, I know this from my experience, and we know he didn't. He was lying. We don't know that he was lying to that degree. I would submit that agents who submit search warrants are entitled to rely on the expertise and the information given to them. I thought he said he had no experience. So when he said he did have experience, it was just a flat-out lie. It was his first child pornography warrant, and Judge Peckman considered that as well and found that. You talked about something other than what I asked you about. I asked you, didn't he say in his testimony that he did not have experience, but he said in his warrant application that he did? His warrant application where he's cut and pasted from the boilerplate that's given to him. At the end of the suppression hearing, Judge Peckman said, strike it off. That reminds me of our asylum cases where some notario or somebody gives people a phony story that's been working, and they all tell the same phony story. When they do that under oath, it's a lie. At least it doesn't put somebody in jail the way when a policeman tells somebody something out of a template that is actually a false statement. It's a lie. And Detective Shremshaw did make a number of reckless misstatements in that warrant. But as Judge Peckman concluded. Reckless misstatements? You mean lies? Yes. All right. Thank you, Counsel. Your time has expired. Mr. Levin, you have some reserve time. Thank you. Just briefly with respect to the Posse Comitatus Act. The government has argued in its papers, and I believe Agent Logan testified himself, that these restrictions don't apply to him at all. If that's the case, that itself establishes the kind of need to prevent future violations that this court. His position was, I'm a federal officer and I can enforce anything. Right. And that's just absolutely untrue. If you look at 10 U.S.C. 7840, it indicates it covers the NCIS and limits their participation to the guidelines prescribed by the Secretary of the Navy. And so those guidelines. Which statute are you talking about now? This is the 10 U.S.C. 7480, which the government's counsel was talking about. Some of those guidelines include Directive 5525.5, which indicates that the Posse Comitatus rule prohibits the forms of direct assistance, including search and seizure and use of military personnel. The one I was talking about, 213.10. I don't know about that one. Some of these rules are mirrors of the rules that are issued by other branches of military. And as I indicated, if the court does want supplemental briefing with respect to the CFRs, I'd be more than happy to oblige. My point is that we probably wanted original briefing from both sides on them. I would think so. This is a new area. If you look at the type of Posse Comitatus Act cases that have come before courts in the past, they've involved cases where the investigation targets on the military and then somehow strays into civilian affairs. And this is the op- Any case like this one where they were simply looking at everybody? No. Well, the only one is the unreported case out of the Sixth Circuit that the government cited to in its papers. And the interesting thing about that case is that there was no unpublished decision, is that it didn't consider these kinds of limitations that the Ninth Circuit has noted. In other words, limitations that military personnel, the jurisdiction covers military personnel and civilians. Thank you, Counselor. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon